Affirmed and Memorandum Opinion filed May 29, 2008








Affirmed and Memorandum Opinion filed May 29, 2008.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-00857-CR

_______________

 

MARGIL TAYDE OCHOA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                      
                                         

On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 1034793 

                                                                                                             
                                  

 

M E M O R A N D U M   O P I N I O N

In this
appeal, Margil Tayde Ochoa challenges the legal and factual sufficiency of the
evidence to support his capital murder conviction.  Because we conclude the
evidence is both legally and factually sufficient, we affirm.








I.  Factual and Procedural Background

On the
afternoon of July 12, 2005, Gina Vasquez and the decedent, Guadalupe Barboza,
left their residence in Northwest Houston to go shopping.  After they returned
home several hours later, they unknowingly interrupted a burglary.  Vasquez saw
a masked person holding a gun step from behind a wall and point the gun at the
decedent.  She fled the house, eventually calling 911 to report the incident.

Harris
County Sheriff=s Department (AHCSD@) deputies responded to the 911 call and arrived at the
house.  After entering through an open back door, the deputies discovered the
decedent lying in the hallway off the den, with pillows covering his back.  He
had been shot twice in the back; his hands were bound behind his back with duct
tape, and his eyes were covered with duct tape.  

Through
the course of investigating the offense, HCSD officers identified appellant and
a friend of his, Abelino Monge, as Apersons of interest.@  Both Monge and appellant agreed to
come into the sheriff=s department for questioning.  After making an official
statement admitting his involvement in the offense, appellant was arrested and
indicted for capital murder.  Appellant=s jury trial began on September 18,
2006.  

A.        The State=s Witnesses








Gina
Vasquez, the decedent=s girlfriend, stated that the decedent owned a landscaping
company and also sold large amounts of drugs.  On July 12, 2005, when she and
the decedent returned from shopping, she began putting groceries away while the
decedent brought the bags in from their vehicle.  After bringing in the bags
and taking out some trash, the decedent walked into the den.  Vasquez stated
that she saw a person who was  Acovered up@ step from behind a wall carrying a gun, which this person
pointed at the decedent.  She ran out of the house through the garage to their
landlord=s house down the street.  Because no
one answered when she pounded on the door,  she became scared that someone
might chase after her and hid in the dirt near the house.  

While
she was hiding, she saw a truck pull up to the decedent=s house; a man she did not know got
out of the truck and knocked on the door.  She testified that she did not
approach this man because she did not know if he was involved with the gunman
she had seen at her home.  She saw this man leave after a few minutes, and then
proceeded next door to find help.  Because no one was home at the next house,
she went back to the home next door to the decedent=s house.  She never saw anyone leave
the decedent=s house.  According to Vasquez, she then called 911.  But on cross‑examination,
she admitted that she called a friend of the decedent=s before calling 911 because she was
aware of the drugs in the house and was concerned she might get the decedent in
trouble by calling the police.[1]   

Deputy
Dellance Davis, an HCSD patrol officer, testified that he was dispatched to a
possible Ahome invasion in progress@ at the decedent=s house at around 5:00 p.m. on July
12.  When he arrived at the house, he and two other responding deputies found
the back door open.  According to Davis, the deputies did not hear anything
from inside the house, so they entered through the back door of the house with
weapons drawn.  Davis noticed the decedent on the floor in the hallway with
pillows over him.  Another deputy checked the decedent for signs of life, while
Davis and the third deputy checked to see if anyone else was in the house. 
After verifying that no one else was there, the deputies secured the scene.








Gary
Clayton, HCSD crime scene investigator, testified that he processed the scene
at the decedent=s house.  Clayton described the layout of the house and
provided photographs and diagrams of the layout.  According to Clayton, the
decedent was found in the hallway near the den of the house, with his feet and
lower body angled into the entrance of the master bedroom.  The decedent had
duct tape over his eyes and his hands were duct taped behind his back.  He had
two pillows over the upper portion of his body; Clayton stated that there was a
bullet hole and gun shot residue on the pillows.[2] 
Clayton testified that the decedent had a black flex cuff on his leg.  A piece
of what appeared to be a blue latex glove was found stuck to the duct tape over
the decedent=s eyes.  Clayton also stated that he collected, among other things, a Aprojectile fragment,@ several shell casings, a large
quantity of marijuana, and a small bag of cocaine at the scene.  According to
Clayton, a latent print was found on the duct tape adhered to the decedent, but
the print was not linked to appellant or Monge.

Deputy
Bradley S. Bruns from the Harris County Regional Firearms Identification
Laboratory explained the differences between a semi‑automatic pistol and
a revolver. Because revolvers typically retain the bullet casings and two shell
casings were found at the scene, Bruns testified that the murder weapon was a
semi‑automatic gun.  He opined that these casings were fired from the
same weapon, but no weapon was recovered in this case.  He identified the
casings as A.380 auto casings@ and the bullet recovered from the scene as a A.380/.38/.357/9‑millimeter
caliber bullet,@ which was consistent with the shell casings.  On cross‑examination,
Bruns acknowledged that a gun capable of firing such rounds could be easily
concealed.








Detective
Mark Reynolds, the lead investigator and a 25‑year veteran with the HCSD,
described the course of his investigation into the decedent=s death.  According to Reynolds, he
arrived at the scene around 6:45 p.m. on July 12, 2005.  He spoke to Vasquez at
the scene and ruled her out as a suspect.  He acknowledged that none of the
witnesses were able to identify a suspect; thus, he would be relying on
physical evidence to identify any suspects.  He also stated that he suspected
that the decedent=s death may have been drug‑related because of the large
quantity of marijuana found at the scene.  According to Reynolds, officers
found no evidence of forced entry at the house.  In addition, because none of
the neighbors saw anyone entering the front of the house, he believed the
perpetrators accessed the house from the back.  

The day
after the murder, Reynolds returned to the decedent=s house.  He found a cell phone between
the backyard of the house and a flood control ditch.  The phone was registered
to A.J. Benny=s Landscape and assigned to appellant=s friend, Abelino Monge.  Reynolds
determined that Monge had reported the phone missing the day after the murder
and had gotten off work early on July 12.  Reynolds stated that HCSD then made
contact with Monge and asked him to come in for questioning about his cell
phone.  Monge came in later that day; during questioning of Monge, appellant=s phone number was identified and
Reynolds determined that he needed to question appellant.  Reynolds indicated
that appellant agreed to come in and answer questions: A[Appellant] came down voluntarily. 
It was reiterated that this was a voluntary interview, that we were
investigating a criminal episode.@  Reynolds explained that after
several hours of questioning, appellant provided a written statement. Appellant=s statement was admitted into
evidence and read to the jury.

According
to appellant=s statement, he initially was Adishonest@ with detectives about how he knew
Monge and the decedent and his relationship with them.  He stated that he has
known Monge since they were children; he indicated he met the decedent through
Monge.  He also stated that it was Acommon knowledge@ that the decedent sold drugs and
usually had Aa lot@ of cash at his house.  Appellant stated that Monge had begun talking
about robbing the decedent for several months prior to the break-in and had
become more serious about it in the two months before the murder   








Appellant
stated that on July 12, 2005, Monge called him in the morning because he was
leaving work early and wanted to break into the decedent=s house to steal money.  Although
appellant said he initially resisted, he eventually agreed to help Monge with
the break-in.  After running several errands, he and Monge drove to the
decedent=s neighborhood; appellant dropped
Monge off near the bayou and then drove past the decedent=s house.  Appellant stated that Monge
had a Acamouflage backpack@ with him and had black cotton gloves
and a black Azip‑tie@[3] sticking out of his back pocket.  When he drove past
the decedent=s house, he stated that it appeared the decedent and his girlfriend were
about to leave.  He called Monge and told him to wait for a few minutes for the
decedent to leave before entering the residence.  He continued past the
decedent=s house, turned around, and drove
back past it; this time, the decedent=s truck was gone.  At that point,
appellant stated he called Monge back and told him appellant and his girlfriend
had left, so he should Ago ahead and break in.@  Appellant stated, AThe plan was for [Monge] to go inside
[the decedent]=s house through the back, from the bayou that runs behind the house, and
I would just look out and warn him if [the decedent] started coming back.@

Appellant
went to a near‑by acquaintance=s house to keep a look out.  Monge
called him a few minutes later and indicated he was inside the decedent=s house, looking for money. 
Appellant told Monge he would call him if he saw the decedent returning. 
According to his statement, however, Monge started calling him and encouraging
him to Acome inside@ the decedent=s house to help him look for money. 
Appellant refused and tried to stall Monge, but Monge called him and told him
he had found Asomething big,@ so appellant walked over to the decedent=s house.








Appellant
stated that Monge let him in through the back door.  He took off his shoes so
he would not leave shoe prints, and suggested to Monge, who was barefoot, that
he put something on his feet.  According to appellant, Monge showed him a large
brick of marijuana that Monge wanted to steal.  Appellant stated that he and
Monge Astarted poking around,@ looking for money.  Appellant wanted
to avoid making a Abunch of mess@ because the plan was to take the money without the decedent
noticing right away.  According to appellant, he was in a back room when he
realized the decedent and his girlfriend, Vasquez, had returned.  He told Monge
that they were there and that they needed to Aroll,@ but the decedent and his girlfriend
were already coming through the garage and into the kitchen.  Appellant stated
that Monge told him to hide; at that time, appellant noticed that Monge was
wearing blue gloves and a black ski mask.  

Appellant
stated that he hid in the hallway near the back bedroom, waiting for the
decedent and his companion to step out of the house so he and Monge could Atake off.@  But they never got a chance to
leave because the decedent came into the hallway near appellant.  When the
decedent turned around and walked back toward the kitchen, appellant heard him
say, AHey, whoa, whoa.@  He then heard Monge telling the
decedent to get down and the decedent replying that he was down.  He came out
from around the corner and saw the decedent, who had his back to appellant,
starting to lay down on the floor.  According to appellant, the decedent had
not seen him, and he moved behind the decedent and pinned him to the floor. 
The decedent neither resisted nor tried to turn around and look at appellant. 
Appellant stated that although the decedent saw Monge, he did not think the
decedent recognized him because Monge was Acovered up.@  Monge ran back towards the garage
once the decedent was pinned to the floor by appellant, apparently looking for
the decedent=s companion.  Monge told appellant that the woman had run to the neighbor=s house, and kept pacing back and
forth from the garage to the living room.  








According
to appellant, he signaled Monge to cover the decedent=s eyes so he could not see them;
Monge retrieved his backpack and took out some duct tape.[4] 
Monge put a piece of duct tape over the decedent=s eyes and taped his hands together
behind his back.  Appellant got up, grabbed his shoes, and motioned for Monge
to leave.  He went towards the back door, but Monge ran into the back of the
house to get the marijuana brick.  At about this time, appellant stated he
heard knocking at the door, but he was preparing to run out the back door. 
Monge yelled at appellant to come back inside, but appellant shook his head Ano.@  On his way out the back door,
appellant grabbed a beer bottle because he had seen Monge drinking it and knew
it had touched Monge=s mouth.   He Atook off running across the backyard
towards the back fence.@  He then heard a A>pop= like a firecracker,@ but continued running towards the
fence.  He climbed the fence, and Monge ran into him from behind and knocked
him onto the ground on the other side of the fence.  Monge fell over, too, and
both he and Monge dropped several items.

They ran
towards the bayou; Monge forged his way across the bayou, but appellant fell
into the water.  He dropped everything he was carrying in the bayou, and was
pulled along the current towards a barricade.  Appellant stated that he saw
that Monge had crossed the bayou, but had dropped everything he was carrying,
as well as losing his mask and gloves.  Appellant managed to climb out of the
bayou and returned to his acquaintance=s house to get his car.  But he no
longer had the keys to his car because he had given them to Monge; he had to
borrow his acquantaince=s car to go home.

After
returning to his house, appellant went to a shooting range with a friend, where
he shot his AColt 38 Super@ before returning home and cleaning his pistol.  The next
morning, he learned that the decedent was dead.  He went to Monge=s apartment later that day, and Monge
told him Aeverything went bad.@  Appellant explained that he asked Monge about the gun and
backpack; Monge replied that he had thrown it all away.  Appellant said that
Monge never told him he shot the decedent, but Ahe didn=t have to[] because I was there when
everything was going down.@








After
appellant=s statement was read to the jury, Reynolds continued testifying.  He
explained that after taking the statement and questioning appellant, Reynolds
returned to the crime scene, where he was able to verify several of appellant=s statements.  For example, appellant
indicated during questioning that Monge had entered the decedent=s house through a rear window. 
Reynolds discovered that a rear window showed signs of having been pried open
recently, although the screen had been replaced.  Additionally, Reynolds found
a latex glove near where appellant said Monge had discarded several items. 
Further, the black flex cuff appellant stated he saw in Monge=s back pocket was discovered on the
decedent=s body.  Several other aspects of
appellant=s story were likewise corroborated by other evidence: Vasquez saw someone
knocking at the door while the robbery was on‑going, and she also stated
that the decedent said Awhoa, whoa@ when confronted by the armed gunman.

Assistant
Harris County Medical Examiner Kathryn Haden‑Pinneri testified regarding
the cause of the decedent=s deathCa gun shot wound to the back which caused severe injury to
three major blood vessels and the heart.  According to Haden‑Pinneri, the
toxicology screen performed on the decedent indicated he had marijuana in his
blood.  She also found several additional pieces of blue latex adhered to the
duct tape she removed from the decedent=s body.

B.        Witnesses for the Defense

After
the State rested,[5] appellant
presented the testimony of three witnesses:  retired U.S. Army Colonel Andrew
R. Bland, Jr., appellant=s wife, and appellant.  Bland testified that he had known
appellant for several years; appellant had been a cadet in the Junior ROTC
program at Sam Houston Senior High School when Bland was a Senior Army
Instructor.  According to Bland, appellant had served at least three years in
the U.S. Army.  Bland testified that appellant had an Aoutstanding@ reputation as a peaceful and law‑abiding
citizen.








Appellant=s wife, Marissa, testified that she
and appellant had been married for five years; they had one young son.  She
stated that appellant had served in the Army at Guantanamo Bay; he had only
recently returned and wanted to spend time with his son.  She acknowledged that
she discovered what had happened on July 12 when appellant was arrested.  She
further stated that appellant and Monge had been close friends for a long time.

Appellant
testified in his defense.  He explained that he gave his statement to police
because Ait was the right thing to do.@  He also knew that he would face
consequences from his actions on July 12, but he gave the statement anyway. 

On cross‑examination,
appellant admitted that Monge was Aupset@ with the decedent because he thought
the decedent had not paid him enough for some work Monge had done for him. 
Appellant testified that because the decedent took Monge=s money, Monge felt like he should
take the decedent=s money; i.e., he should Agive him a dose of his own medicine.@  According to appellant, after the
decedent and Monge Afell out@ over money, he occasionally bought marijuana from the
decedent for Monge.  Appellant testified that, the day before the break-in, he
made plans to buy special Ahydroponic weed@ from the decedent for Monge, which
the decedent could only obtain out of town.  He stated he contacted the
decedent the morning of the break-in to find out whether the decedent planned
on picking up the Ahydroponic weed@ that day.  He claimed he called the
decedent while in the process of burglarizing his house to make sure the
decedent was not going to come back any time soon. 













According
to appellant, breaking into the decedent=s house was a Aspur of the moment@ plan.  He also testified he had
never known Monge to have a gun, and he had no idea where Monge had obtained
the gun.  He emphasized that he never saw Monge with the gun, even when Monge,
according to Vasquez, was pointing the gun at the decedent.  Appellant
explained that he did not see the gun because he and the decedent were on the
other side of a closed door from Monge when the decedent lowered himself to the
ground in response to Monge=s order.[6]  He further
insisted that, when Monge came into the hallway through that closed door, Monge
was not holding a gun.  When asked, he responded he had Ano clue@ how the pillows were placed  on the
decedent=s head or how the screen was put back
on the window that Monge had pried open to gain entry to the house.  He also
insisted that he never spoke while in the decedent=s presence; he stated that he used
hand signals to communicate with Monge, although Monge verbally responded.  He
acknowledged that the decedent would have recognized both him and Monge, as
well as their voices.  

According
to appellant, Monge caught up with him Aabout 15 seconds@ after appellant ran out of the
decdent=s house.  He admitted that, after
fleeing the scene, he thought the decedent had died.  He stated that he asked
Monge what happened regarding the shot he had heard while running away, but
Monge refused to talk about it.  Appellant explained his failure to notify
authorities after the murder: AWell, I figured with all the stuff there, they were going to
catch us eventually and I might as well enjoy the little time with my family.@  He testified that he went to the
shooting range after the events at the decedent=s house because he was nervous and
needed Ato blow off some steam.@  He also acknowledged that he should
be incarcerated for his involvement with this offense.

C.        Rebuttal








After
appellant testified, the defense rested.  The State called Nolan McClay as a
rebuttal witness.  McClay testified that he was the person who had knocked on
the decedent=s front door while appellant and Monge were inside with the decedent. 
McClay explained that he was considering hiring the decedent to do some
landscape work and had arranged to talk about the work with the decedent that
afternoon.  McClay stated that when he approached the decedent=s front door to knock, he heard two
voices arguing inside the house, although he initially assumed the voices were
the decedent=s and Vasquez=s.  But he testified that the voices Adefinitely could have been two males,
could have been a male and a female.@  He speculated that the voices were
coming from the hallway near the front door, although he acknowledged they
could have been coming from the front bedroom.  According to McClay, he called
the decedent several times while he was at his house, but the calls were
unanswered.  He went back and forth from the front door to his truck between knocking
on the door.  McClay testified that, after knocking on the decedent=s door for a second time, he heard Atwo pops,@ which he thought might have been
firecrackers popping, when he was walking back to his truck.  He left after
knocking on the door several times.

After
hearing the evidence, the jury found appellant guilty of capital murder.  The
trial court sentenced him to life in prison.  This appeal timely ensued.

II.  Issues and Analysis

In two
issues, appellant challenges the legal and factual sufficiency of the evidence
to support his conviction as either a party or a conspirator to capital murder.

A.        Sufficiency of the Evidence

When
reviewing the legal sufficiency of the evidence, we do not ask whether we
believe the evidence at trial established guilt beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 318B19, 99 S. Ct. 2781, 2789 (1979). 
Rather, we examine all the evidence in the light most favorable to the verdict
to determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Id. at 319, 99 S.
Ct. at 2789; Mason v. State, 905 S.W.2d 570, 574 (Tex. Crim. App. 1995)
(en banc).  Our review of the evidence includes both properly and improperly
admitted evidence.  Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim.
App. 2007).  We consider both direct and circumstantial evidence, and all
reasonable inferences that may be drawn therefrom in making our determination. 
Id.








When
reviewing the factual sufficiency of the evidence, on the other hand, we view
all the evidence in a neutral light and set aside the verdict Aonly if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.@  Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997) (en banc) (quoting Clewis v. State, 922
S.W.2d 126, 129 (Tex. Crim. App. 1996) (en banc)).  Before we may reverse for
factual insufficiency, we must first be able to say, with some objective basis
in the record, that the great weight and preponderance of the evidence
contradicts the jury=s verdict.  Watson v. State, 204 S.W.3d 404, 417 (Tex.
Crim. App. 2006).  When reviewing the evidence, we must avoid intruding on the
factfinder=s role as the sole judge of the weight and credibility of the witness
testimony.  Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (en
banc). We do not re‑evaluate the credibility of witnesses or the weight
of evidence, and we will not substitute our judgment for that of the
factfinder.  Johnson v. State, 967 S.W.2d 410, 412 (Tex. Crim. App.
1998). 

The jury
charge in this case authorized conviction for capital murder if appellant (a)
shot the decedent;[7] (b) was a
party to Monge=s shooting of the decedent;[8] or (c) was a
conspirator to Monge=s shooting of the decedent.[9] 
Because the jury returned a general verdict, we will  uphold the verdict if the
evidence is sufficient to support the guilty finding under any theory submitted
to the jury.  Hernandez v. State, 171 S.W.3d 347, 353 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d) (citing Rabbani v. State,
847 S.W.2d 555, 558 (Tex. Crim. App. 1992) (en banc)).

B.        Evidence of Guilt as a
Conspirator








Appellant
does not dispute that he entered a conspiracy with Monge to commit the felony
offense of burglary or that Monge shot the complainant in furtherance of the
burglary.[10]  Thus, we
focus our inquiry on whether the record supports a conclusion that appellant is
criminally responsible for Monge=s shooting of the decedent because he
should have anticipated the murder as a result of carrying out their burglary
conspiracy.  See Tex. Penal Code
Ann. ' 7.02(b).  

Appellant
asserts there is no evidence that he should have anticipated that murder would
result from carrying out the originally conspired burglary because he had no
knowledge that his co-conspirator, Monge, was armed.  Cf. Flores v.
State, 681 S.W.2d 94, 96 (Tex. App.CHouston [14th Dist.] 1984), aff=d, 690 S.W.2d 281 (Tex. Crim. App. 1985) (concluding
evidence was sufficient to support capital murder conviction because appellant
conspired to burglarize a home, decedent was shot during the furtherance of the
burglary, and appellant knew his co-defendant had a gun and should have
anticipated the shooting).  But,

[i]t is
reasonable to infer that when a person joins with two other persons and
burglarizes a residence in midday, he should anticipate that they might be
confronted by the occupant or discovered by an onlooker, and that his
co-conspirators might react violently to that confrontation.  It is further
probable that the co-conspirator, if not already armed, might arm himself with
weapons found in the residence.

Sarver v. State, 24 S.W.3d 448, 452 (Tex. App.CTexarkana 2000, pet. ref=d).  Although the appellant in Sarver
was convicted of aggravated assault, this rationale is equally applicable in
this case,  if not more so.  








In Sarver,
the appellant and his co-conspirators broke into the victim=s house during daylight hours while
the homeowner was at work.  Id. at 451.  A neighbor saw the men enter
the backyard of the house, became suspicious, got his own gun, and went to the
house to investigate.  Id.  While the neighbor was investigating, he was
shot by one of the burglars, who used a gun taken from the homeowner=s briefcase found inside the house.  Id. 
One of the appellant=s co-conspirators then shot the neighbor several more times,
took his gun, and all three burglars fled on bicycles.  Id.  The Sixth
Court of Appeals concluded that this evidence was both legally and factually
sufficient to support the appellant=s conviction as a conspirator to the
offense of aggravated robbery.  Id. at 452.

In this
case, the evidence is even stronger that appellant should have anticipated that
he and Monge might be confronted by the decedent, and that Monge might react
violently to that confrontation.  First, as discussed above, appellant
initially remained outside the home to act as a lookout and warn Monge if the
decedent returned.  Thus, he anticipated the decedent=s return.  And despite his apparent
awareness that the decedent might return at any moment, appellant joined Monge
inside the house and remained in the house for about an hour and a half. 
Moreover, appellant knew that Monge brought duct tape and a zip-tie to the
burglary, from which a jury could rationally infer that Monge anticipated
binding the decedent.  








Second,
appellant stated that Monge believed the decedent had underpaid him by $1,200
for work he had done for the decedent.  In fact, appellant stated that Monge
was Aupset@ with the decedent and referred to
the fact that the two had had a Afalling out@ about the money.  Thus, appellant
should have anticipated that Monge, if confronted by the decedent, might become
violent.[11] 
Additionally, appellant stated that he, Monge, and the decedent all knew each
other quite well; thus, he should have anticipated that, if confronted by the
decedent, the decedent would be able to identify them.  Nevertheless, appellant
did not wear a mask or otherwise attempt to disguise his appearance, although
he insisted that the decedent did not see him and that he did not speak in the
decedent=s presence.[12]


Finally,
appellant should have anticipated that Monge, if not already armed, might arm
himself with weapons found in the residence.[13] 
Indeed, appellant himself suggests that the gun used to kill the decedent may
have belonged to the decedent.[14]  In light of
his allegation, he cannot deny that he should have anticipated that the
decedent, who was involved in the drug trade and was known to keep large sums
of cash at his house, would have weapons in his residence, if not on his
person.  See, e.g., Carmouche v. State, 10 S.W.3d 323, 330
(Tex. Crim. App. 2000) (discussing fact that A>weapons and violence are frequently
associated with drug transactions=@) (quoting United States v. Brown,
913 F.2d 570, 572 (8th Cir. 1990)).   Thus, he should have anticipated that
Monge, if not already armed, could arm himself with weapons found in the
decedent=s house.  Sarver, 24 S.W.3d at
452; see also Hernandez v. State, 171 S.W.3d at 355; Moore v. State,
24 S.W.3d 444, 446B47 (Tex. App.CTexarkana 2000, pet. ref=d).








Viewing
this evidence in the light most favorable to the verdict, we conclude that a
rational trier of fact could have found that appellant should have anticipated
the shooting of the decedent in furtherance of the burglary conspiracy. 
Because appellant has not challenged the sufficiency of any of the other
elements necessary to support his conviction, we conclude the evidence is
legally sufficient to support his conviction for capital murder as a
conspirator.  We therefore overrule appellant=s first issue.  Furthermore, viewing
this evidence in a neutral light, we cannot say that the jury=s verdict is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.   We
therefore overrule appellant=s second issue.

III.  Conclusion

Having
concluded that the evidence is legally and factually sufficient to support
appellant=s conviction of capital murder, we affirm the judgment of the trial
court.

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Memorandum
Opinion filed May 29, 2008.

Panel consists of Justices Yates,
Guzman, and Lee.*

Do Not Publish C Tex.
R. App. P. 47.2(b).









[1]  Vasquez also admitted that the decedent had
purchased a large bale of marijuana earlier that day, although she stated that
he sent her out of the room so he could buy the drugs.  She further
acknowledged that she had about $3,000 in cash on her person on the day of the
murder.





[2]  It is unclear whether there was more than one bullet
hole in the pillows over the decedent=s
upper body, but the decedent was shot twice in the back.





[3]  Deputy Clayton and Detective Reynolds described this
item as a Ablack flex-cuff.@





[4]  Appellant indicated in his statement that, earlier
in the day while he and Monge were at appellant=s residence, Monge had asked appellant for duct tape.  Appellant stated
he told Monge where to find the duct tape, and although he did not see Monge
pick up the duct tape, he assumed Monge did so.





[5]  The State and appellant entered a joint stipulation
that appellant was excluded as a possible contributor to DNA evidence collected
from the rubber glove found at the scene.  Additionally, with the permission of
the trial court and consent of the State, appellant presented the testimony of
one of his witnesses before making a motion for instructed verdict.  This
motion was overruled. 





[6]    The following exchange occurred during cross
examination regarding appellant=s contention
that he never saw Monge with a gun:

Q.         [The decedent was g]etting down on the
ground?

A.         Yes, ma=am.

Q.         So, what did you do?

A.         I went over to him and placed my hand
between his shoulder blades.

Q.         Okay.  And what did Mr. Monge do?

A.         At that point he kicked in through the
door. . . . 

Q.         He kicked the door in?

A.         It wasn=t
closed.  So, he just, like B just, like,
kicked it, but nothing shattered or nothing.

Q.         And did he have the gun in his hand then?

A.         No, ma=am.

Q.         Where had he put it?

A.         I couldn=t
tell you, ma=am.

Q.         So, your testimony then is that B your testimony then is that B okay.  So, [the decedent]=s running away from Mr. Monge, closes the door behind
him, goes into the hallway, thinks he=s
away from the man with the gun and just lays down on the ground, right?

A.         He threw the door and lays [sic] down on
the ground.

Q.         And laid down on the ground, thinking the
door=s going to stop him B the man with the gun from getting to him.  Of course, since B if he=s on the
ground, he can=t get up and run.  He=s just a sitting target, right?

A.         Yes, ma=am.

Q.         Now, so, then Mr. Monge is on the other
side with the gun, he says, you know, I don=t
want [appellant] to see my gun and he just ran away from me; so, I=m going to hide it and I=m going to kick the door and go in without a gun.

Is that your testimony?

. . . 

A.         No, it is not ma=am.

Q.         When he came into the hallway,
he didn=t have a gun in his hand?

A.         No, he didn=t, ma=am.

Q.         And you noticed that?

A.         Yes, I B

Q.         You looked for it?

A.         Yes, I did, ma=am.





[7]  The State acknowledges there is no evidence that
appellant shot the decedent.





[8]  A person is criminally responsible as a party to an
offense committed by another person if, Aacting
with intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense. . . .@  Tex. Penal
Code Ann. ' 7.02(a)(2) (Vernon 2003).





[9]           If, in the attempt to carry out a
conspiracy to commit one felony, another felony is committed by one of the
conspirators, all conspirators are guilty of the felony actually committed,
though having no intent to commit it, if the offense was committed in
furtherance of the unlawful purpose and was one that should have been
anticipated as a result of the carrying out of the conspiracy.

Id. '
7.02(b).





[10]  In his appellate brief, appellant states that he

did not
contest at trial, and does not now, that the evidence was sufficient to prove
he and Abelino Monge conspired to commit the offense of burglary of the
complainant=s home and that Monge committed the separate felony of
murdering the complainant.  There was likewise no evidence contesting the State=s contention that Monge shot the complainant in
furtherance of the burglary, although how the shooting furthered the stated aim
of obtaining money remains unclear.  The relevant inquiry, therefore, is
whether [a]ppellant should have anticipated that Monge would murder the
complainant as a result of them carrying out the conspiracy of burglary.





[11]  See Herrin v. State, 125 S.W.3d 436, 442
(Tex. Crim. App. 2002) (noting that the fact that a victim owed money to his
killer provided a motive for murder); see also Beets v. State, 767
S.W.2d 711, 735 (Tex. Crim. App. 1987) (en banc).





[12]  Appellant=s
testimony that he did not speak in the decedent=s presence was contradicted by the rebuttal testimony of McClay, who insisted
that he definitely heard two voices arguing inside the residence shortly before
the decedent was shot.  See Jones v. State, 984 S.W.2d 254, 258 (Tex.
Crim. App. 1998) (en banc) (A[A] jury is
permitted to believe or disbelieve any part of a witness=[s] tesimony, including a defendant.@). And avoiding identification can be a motive for
murder.  See Beets, 767 S.W.2d at 735B36
(noting that, in a prior case, the Court concluded Athe purpose of the killing was to avoid identification@); Hernandez v. State, 171 S.W.3d 347, 354
(Tex. App.CHouston [14th Dist.] 2005, pet. ref=d) (A[A]ppellant
told him that, because appellant knew the [victim], appellant would have to
kill him.@).





[13]  The jury was entitled to disbelieve appellant=s self-serving statements that he never saw Monge with
a gun.  Bustamante v. State, 106 S.W.3d 738, 741 (Tex. Crim. App. 2003).





[14]  Appellant states in his brief,

Appellant=s suggestion that the gun might have belonged to the
complainant himself is entirely plausible, and the State offered no evidence to
controvert it.  The complainant was a drug dealer handling large amounts of
dope worth incredible amounts of money . . . . 





* 
Senior Justice Norman Lee sitting by assignment.